## FIRST NAT. BANK OF POCASSET v. MELTON & HOLMES.

No. 20755. Opinion Filed Feb. 23, 1932.

Rehearing Denied March 29, 1932.

64

Bailey & Hammerly, for plaintiff in error.

Melton & Melton, for defendants in error.

CULLISON, J. Plaintiffs instituted suit against defendant bank, seeking to recover damages for the wrongful conversion of six bales of cotton of the value of $255. Defendant answered by special denial that plaintiffs were not the owners and in possession of said cotton, and specifically denied that it converted to its own use and benefit any cotton belonging to plaintiffs.

Defendant, further answering, alleged that A. T. Lyons delivered to defendant five bales of cotton and no more, with authority for defendant to sell the same and apply the proceeds on indebtedness due defendant secured by a mortgage on said cotton; that defendant sold said cotton and tendered to plaintiffs their one-fourth of the proceeds of the said cotton, the same being the landlord's share; and defendant renewed said tender in court; that Lyons was the owner of said cotton with authority to sell the same and that he surrendered said cotton to the defendant.

Plaintiffs replied denying defendant's answer, and further pleaded that Lyons and the defendant herein knew that said cotton was raised on plaintiffs' farm and that plaintiffs had a lien on said cotton to pay the rent due thereon, and that defendant converted said property with full knowledge that the same belonged to plaintiffs.

The parties will be referred to as they appear in the lower court. The case was tried to a jury, but at the conclusion of all the evidence the court dismissed the jury and rendered judgment for plaintiffs.

Defendant appealed to this court, and the first assignment of error presented in its brief is:

"That the trial court erred in overruling the demurrer of the defendant to plaintiffs' evidence."

The record in the instant case discloses that plaintiffs owned a large farm near Pocasset, Okla. In 1926, plaintiff rented said farm to one A. T. Lyons, and under the rental contract plaintiffs were to receive one-fourth of the cotton raised by Lyons on said farm. Lyons planted 180

acres of said land to cotton, which produced about 115 bales. Plaintiffs advanced money to Lyons to pay the cotton pickers.

As the cotton was being picked Lyons would haul the cotton to the town of Pocasset, where he had it ginned and baled, then would sell the cotton and deposit the proceeds thereof in defendant's bank. Lyons would then go to Chickasha, Okla., the home of plaintiffs, make settlement with plaintiffs for amount of cotton picked, ginned, and sold, and give plaintiffs a check on defendant's bank for one-fourth of the amount for which said cotton was sold in payment of rent due.

This method of settlement between plaintiffs and Lyons for payment of rent continued until late in the fall of said season, or near the close of the cotton picking season. Sometime later in the season, or a short time before the last cotton was picked, plaintiffs and Lyons had a settlement which showed that Lyons had paid plaintiffs in full for money advanced by plaintiffs to pay cotton pickers, but left a balance of $127 due plaintiffs for rent on land.

After the settlement above mentioned, and in fact at the conclusion of said settlement, it was agreed by and between plaintiffs and Lyons that Lyons would continue to pick the cotton until it was all picked; that when the picking of the cotton was finished, he, Lyons, would haul the same to Pocasset, have it ginned and baled, and deliver the same to this plaintiff at Chickasha, Okla., in payment of rent due.

Lyons, in pursuance of his agreement with plaintiffs, did pick the cotton, amounting to five bales, hauled it to Pocasset, had it ginned and baled and stored it in the cotton yard at Pocasset.

About the time of the storing of the cotton in dispute in the yards at Pocasset, or a very short time before the cotton was stored, Lyons became very ill and was confined to his bed for some weeks with smallpox. During Lyons' sickness and confinement in bed he sent his son to Chickasha to inform plaintiffs that he, Lyons, was down in bed sick with smallpox; that the cotton had been picked, ginned, and baled; that he had stored the cotton in the cotton yards at Pocasset, but was unable to deliver the cotton to plaintiffs at Chickasha on account of his illness, and that plaintiffs had better look after the cotton.

Mr. Holmes, one of the plaintiffs, immediately took possession of the cotton and sold the same to cotton buyers in Pocasset. The record shows that defendant bank had a mortgage on everything Lyons owned, including the entire cotton crop raised by Lyons on plaintiffs' land. Defendant learned that plaintiffs had taken possession of the five bales of cotton in dispute and had sold the same to cotton buyers there in Pocasset.

Immediately after defendant learned that plaintiffs had taken possession of the cotton and sold it, Mr. N. C. Hill, vice president of defendant bank, went out to the home of Lyons, the renter, where he found Mr. Lyons ill and in bed. Mr. Hill made two visits or calls on Lyons at his home on the farm. At the time of Hill's first visit to see Lyons it seems from the record Hill did not have much to say. He only asked Lyons what Holmes meant by selling the cotton. Lyons said, "He guessed Holmes was trying to get what he owed him." After Mr. Hill returned to town (Pocasset) he, Hill, in some manner and from some person (the record is not clear on this point) succeeded in getting hold of the scale tickets, showing the weight and amount of the cotton in dispute. Hill then took possession of the five bales of cotton, sold them, and received, as alleged, $255 for the same.

Thereafter, Mr. Hill made a second call on Mr. Lyons, at which time, defendant alleges in its answer:

"That on or about the 25th day of February, 1927, one A. T. Lyons delivered unto this defendant five bales of cotton and no more, with authority and direction to sell the same and to apply the proceeds from such sale to indebtedness due this defendant."

We have very diligently read the entire record in the instant case, and are unable to find sufficient competent evidence to substantiate the above statement alleged in defendant's answer.

The defendant in its answer says Mr. Hill called on A. T. Lyons February 25, 1927. The record does not show the date of his call. The record does not show that A. T. Lyons delivered five bales of cotton to Mr. Hill. Neither can we find any sufficient competent evidence showing that Mr. Lyons ever authorized or directed defendant or Hill to sell the cotton in dispute and apply the proceeds thereof to Lyons' indebtedness due defendant.

We do find on page 58 of the record the following notation, designated "Defendant's Exhibit 6":

"Credit: Please let N. C. Hill have all cotton on yards. A. T. Lyons, __ 192__."

It will be observed exhibit 6 purports to be an order from Lyons to let N. C. Hill have the cotton in dispute. A careful ex-

amination of the exhibit discloses that no amount of cotton whatsoever is mentioned. The purported order is not directed to any person. No place of delivery mentioned, except "on yards." No person is named to whom delivery should be made. And no location of yards or place named where yards are located. The exhibit does not authorize defendant or anyone to sell the cotton. Neither does the exhibit bear any date whatsoever.

We do. not regard the exhibit as a valid or sufficient order to deliver the cotton in question to Mr. Hill, or to authorize him to sell the same, as required by law. We think the exhibit is so indefinite and so uncertain that no legal significance can be attached thereto.

For the above reasons, the court must rely solely upon the testimony of various witnesses in the case in order to determine the real facts and the interests of the parties litigant.

Pertinent Testimony of Sundry Witnesses.

Mr. Hill, vice president of defendant bank, testifying as a witness for the bank, was asked the following questions and gave the following answers thereto:

"Q. I hand you exhibit '6' that has been offered in evidence and I will ask you to state what that is? A. That is a statement I wrote out for Mr. Lyons to sign, authorizing him to turn over those five bales of cotton to me and let me sell them. Q. He signed that statement, did he? A. He did. Q. And you took this statement and did what? A. I taken it back to the gin yards and showed that I had authority to take the cotton. Q. You took that statement back to the gin yard and on the authority of that statement took the five bales of cotton and sold them? A. Yes, sir."

Cross-examination of the witness (Hill):

"Q. Now, when you went out to see Lyons about this cotton he told you he had already turned it over to Holmes, and Holmes (who) had sold it, didn't he? A. No. Q. What? A. No, sir. Q. What did he tell you about it? A. The first time I went out to see Mr. Lyons I asked him what he (Holmes) meant by selling the cotton, and he told me he didn't know. Q. The first time you went out to see Lyons you knew that Holmes had the cotton or had sold it? A. I wanted to know if he had given him authority to do that. Q. You knew that he had sold it, didn't you? A. Yes, sir. Q. Now, you went back to town that evening and had those checks turned down, didn't you? A. Yes, sir. Q. And then the next day you went out and got this so-called order you have offered in evidence, is that right? A. I believe it was the same day. I am not positive. Q. You went out there, though,

twice before you got it? You did not get it the first trip? A. No, sir. Q. The first trip is when you told him Holmes had sold this cotton? A. Yes, sir. Q. At that time you had already applied the $100, told him at that time you had applied the $100 on his note, and you didn't know he owed him at that time? A. I told Lyons I had applied $100 on his note. Q. And he told you that $100 was rent he owed . Holmes, didn't he? A. He told me he owed Holmes. Q. Didn't he tell you he owed him $100? A. Yes, sir. Q. There wasn't any question about that, was there; there wasn't any question about Lyons owing Holmes $100 rent, was there? A. I guess not. Q. You knew that, didn't you? A. I knew it after Lyons told me."

Thereafter, Mr. Melton reads from the written testimony of Leona Lyons:

"Q. What did you tell Holmes about it? A. I first came down and told him it was to be delivered at a certain time and Papa taken sick, he could not deliver it, and I come back and told him we could not deliver it at that time, that it was up there. Q. You told him that the cotton was up at Pocasset? A. Yes, sir. Q. Told him to go get it? A. Yes, sir. Q. Your father had instructed you or directed you do that, had he? A. Yes, sir. Q. Did you tell Holmes your father was sick and he had sent word he hadn't been able to get that cotton down there? A. Yes, sir."

Plaintiff introduces written testimony, in part, of A. T. Lyons:

"Q. At the time Hill came out to get you to sign this order for this cotton, you told him Holmes had the cotton and was trying to get this rent out of it? A. Yes, he came over and asked me what Mr. Holmes meant; I told him I supposed he was getting his rent. Q. Hill told you Holmes came out and took this five bales of cotton? A. He told me he had already sold it. Q. At the time Hill got you to sign this order for the cotton he knew already that Holmes had the cotton and had sold it to Minter Brothers and Davidson? Told you that? A. Yes, sir. He asked me what Holmes meant; I told him I supposed he was getting his rent. Q. The bank had got his (Holmes) rent, hadn't they, the $100? A. Yes, sir. Q. And you told Hill the bank got the $100, —knew Holmes was trying to get it out of the cotton,—something to that effect? A. Yes. Q. You did agree with Holmes you would pick this cotton and bring enough down to Chickasha to pay that $100 rent that the bank took, didn't you? A. Mr. Holmes and me made this agreement: I told him if I wouldn't get into any trouble about picking this cotton and hauling it down there, Mr. Hill had a mortgage on it, I would haul it down here and turn it over. Q. The reason you didn't haul it down here and turn it over to him is you got sick? A. Yes, sir." Defendant rests.

RILEY, HEFNER, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., concurs in the conclusion. CLARK, V. C. J., and ANDREWS, J., absent.